UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



———————————————————————————

DANIEL JONES,

Plainitff,

-v-                                              AMENDED COMPLAINT

ANNIE MANE McGRATH, Deputy Commissioner,      20-CV-1417-S
JOSEPH FRANCHINI, Assistant Commissioner,
JOHN DOE, JANE DOE, Movement and Control
Officer, JAMES THOMPSON, Superintendent,
JOHN DOE/ JANE DOE, Collins Movement
Officer, P. ZACCAGNINO, Deputy Superintendent,
SZALUZZI, Correction Officer, WENDLAND,
Superintendent, ROY P. SNYDER, Deputy
Superintendent, RENE M. LAWRENCE, Sergent,
REBECCA GARLINGHOUSE, Steward, ALEXANDER
C. MELNICK, Correction Officer, CATE,
Correction Officer, ANTHONY J. ANNUCCI,
Commissioner, M. HUGHES, Inmate Accounts,
Ulster, EILEEN M. NEIF, Supervising Budget
Analyst, DOCCS, JOHN DOE/ JANE DOE, Transportation
Officers, JANE DOE, Alburn Medical Staff, and
JANE DOE, Ulster Medical Staff.

———————————————————————————

## I. JURISDICTION AND VENUE

1.   This is a civil action authorized by 42 U.S.C. §§ 1983 and 1985
to redress the deprivation, under color of state law, of the rights
secured by the Constitution of the United States. The court has
jurisdiction under 28 U.S.C.Sections 1331 and 1343(a)(3). Plaintiff
seeks declaratory relief and for injunction relief authorized by
28 U.S.C. Sections 2283 and 2284, and Rules 54, 57, 58, and 65 of
the Federal Rules of Federal Procedures.

2.   The Western District of New York is an appropriate venue under
28 U.S.C. Section 1391(b)(2) because it is where the events giving
rise to these claims occurred.

## II. PLAINTIFF

3.  Plaintiff, Daniel Jones, (hereinafter plaintiff) mentioned herein, presently residing at Central New York Psychiatric Center, 9005 River Road, P.O. Box 300, Marcy, New York 13403-0300.

4.  Defendant, Annie Mane McGraft, Deputy Commissioner of Movement and Control,DOCCS, 1220 Washington Avenue, Albany, NY 12226

5.  Defendant, Joseph Franchini, Asst. Commissioner of Movement and Control, DOCCS, 1220 Washington Avenue, Albany, NY 12226.

6.  Defendant, John Doe/Jane Doe, Movement and Control Officer, DOCCS, 1220 Washington Avenue, Albany, NY 12226.

7.  Defendant, James Thompson, Collins Correction Facility, Superintendent, P.O. Box 490, Collins, NY 14034-0490.

8.  Defendant, John Doe/Jane Doe, Collins Movement Officer, P.O. Box 490, Collins NY 14034-0490.

9.  Defendant, P. Zaccagnini, Collins Facility, Deputy Superintendent P.O. Box 490, NY Collins NY 14034-0490

10.  Defendant, Correction  Officer Szalizzi, Collins Facility, P.O. Box 490, Collins, NY 14034-0490.

11.  Defendant, Wendland, Superintendent Ulster Facility, 750 Berme Road, NY 12458-0800

12.  Defendant, Roy P. Snyder, Deputy Superintendent, Ulster Facility, 750 Berme Road,  Napanock, NY 12458-0800.

13.  Defendant, Sergent Rene M. Lawrence, Ulster Facility, 750 Berme Road, Napanock, NY 12458-0800

14.  Defendant, Rebecca Garlinghouse, Steward, Ulster Facility, 750 Berme Road, Napanock, NY 12458-0800.

15.  Defendant, Alexander C.  Melnick, Correction Officer, Ulster Facility, 750 Berme Road, Napanock, NY 12458-0800.

16.  Defendant, Correction Officer Cate, Ulster Facility, 750 Berme Road, Napanock, NY 12458-0800.

17.  Defendant, Anothony J. Annicci, Commissioner, Department of Corrections and Community Supervision, State Campus, 1220 Washington Avenue, Albany, NY 12226.

18.  Defendant, M. Hughes, Inmate Accounts, Ulster Facility, 750 Berme Road, Napanock, NY 12458-0800

19.  Defendant, Eileen M. Neif, Supervising Budget Analyst, DOCCS, 1220 Washington Avenue, Albany, NY 12226.

20.  Defendant, John Doe/Jane Doe, Transportation Officers, Alburn Facility, 135 State Street, Alburn NY 13024-9000

21.  Defendant, Jane Doe, Alburn Medical Staff, Alburn Facility, 135 State Street, Alburn, NY 13024-9000.

22.  Defendant, Jane Doe, Medical Staff, Ulster Facility, 750 Berme Road, Ulster, NY 12458-0800.

23.  Each Defendant is sued individually and in his/her official capacity. At all times mentioned in this complaint each defendant acted under the color of law.

## FACTS

24.  On September 23, 2020, Plaintiff filed with the Clerk of the Court, Western District of New York. a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. By Order dated December 9, 2020, the Court granted plaintiff's application to proceed in forma pauperis and directed that plaintiff within 45 days of the entry of the Order file an Amended Complaint.

25. In 1992, Plaintiff was convicted after a jury trial of burglary, sexual abuse and attempted rape, and sentenced to a term of imprisonment of 10 to 20 years. Plaintiff was held to his maximum expiration date in 2012. Before his release though, New York State filed a petition for civil confinement management under Article 10 of Mental Hygiene Law (MHL). He was held at Collins Correction Facilty as a pretrial civil detainee.

26. The Erie County Supreme Court on November 2017, determined that Plaintiff was dangerous sex offender with a mental abnormality and civilly confined him pursuant to MHL §§10.03(e) and 10.07(f). He was ordered to be transfered to the Office of Mental Health. Plaintiff although a free citzen, was held involuntarily as a civil detainee.

27. As Plaintiff was no longer a pretrial detainee and had been committed to a mental hospital, procedures outlined in Article 16 of Correction Law and the Mental Hygiene Law mandated the procedures for the transfer of a patient from DOCCS to OMH custody. When the order of commitment was issued, plaintiff possessed a liberty interest and rights as articluated in the statutory law regarding his transfer to a mental hospital.

28. In Correction Law regarding transfers delegates the Commissioner the sole duty and responsibility to transfer inmated from one facility to another. Based on the commissioner's authorization the superintendent of the facility that is transfering the person, takes steps to make the transfer in accordance with the rules and regulations promulgated by the commissioner.

29.  Based on the court's order of commitment of Plaintiff, Collins' Superintendent Thompson in accordance with the law contacted the commissioner for authorization to transfer Plaintiff from DOCCS custody to OMH custody. Upon authorization of Annucci, directed his subordinates, Deputy Commissioner and/or Asst. Commisssioner to process Superintendent Thompson's request for Plaintiff transfer to the custody of an OMH facility.

30. In response to the direction of DOCCS superiors, John Doe/ Jane Doe, Movement and Control Officers commenced the process of preparation of Plaintiff's transfer to OMH.

31. Upon completion of the transfer process, officers of Movement and Control at DOCCS office informed Superintendent Thompson that Plaintiff was approved for the transfer from DOCCS to an OMH facility, Central New York Psychiatric Center, in Marcy, New York. The order was transmitted between November 21st and November 30th, 2017, to Collins' Superintendent.

32. Superintendent Thompson upon receipt  of that order to transfer Plaintiff, directed his staff at Collins, Movement and Control officers to commence the transfer papers of Plaintiff to be transported to Central New York Psychiaric Center via several state facilites. The transfer order directed that Plaintiff be transported for 6 days across the state of New York before releasing him to the custody of OMH, Central New York Psychiatric Center (CNYPC).

33. On November 30, 2017 at about12:34 pm, Plaintiff was directed to take all his personal property to the draft processing room to be packed up, as he was leaving the facility the next day. Plaintiff took all his personal property to the draft room. Draft room officer

Szaluzzi told Plaintiff that he could packup four bags of personal
property. The only items he would be permitted to pack up would
be limited as he was going to Central New York Psychiatric Center
(CNYPC). Officer Szaluzzi determined what property Plaintiff would
be permitted to pack up. In the first draft bag all of DOCCS clothing
and footware. The second bag of property was his legal materials
and the remaining bags were his personal property that would fit.

34.   The property that Plaintiff was permitted to take was listed
on DOCCS I-64 Form. The form list the items inmates are permitted
to take to another correction facility even though Plaintiff was
not going to a correctional facility. As all his personal property
would not fit in the four property bags. C.O. Szaluzzi told Plaintiff
that property would be destroyed. Plaintiff requested that his
family be permitted to pick-up the remaining personal property
the following day as they lived only 45 minutes away in Buffalo.
C.O. Szaluzzi denied that request. Plaintiff then asked to speak
to the Superintendent and that request was also denied.

35. Plaintiff was not permitted to take any food items. He had
recently  went to commissary and had two food packages from family
that had to be destroyed. Also books , magazines, religious material,
writing utensils, pens, markers, color pencils, calculator, radio,
personal clothing, linen, towels, shoes, fan, and other items.

36.   On December 1, 2017, Plaintiff reported to the draft processing
room to be transfered. Prior to leaving the facility, Plaintiff
was strip searched, his body cavity searched, handcuffed with a
black box attached, and then placed in leg shackles. He was then
placed in a holding pen for several hours.

37.    Around 11:00am, Plaintiff was leg shackled to another inmate, placed on a transit bus for Wende Facility. An hour ride to Wende, at the facility, placed in a holding pen crowded with other inmates. No seating, Plaintiff had to stand shackled to the other inmate. Provided a bag lunch, consisting of bologna/ cheese, apple and fruit drink. Had to stand eating in handcuffs which was very difficult. Using the bathroom in the open with the inmate attached to him. Not able to wash hands afterward. Remained in holding pen for several hours, then about 2:00 pm, re-shacked with another inmate and placed on a transit bus for Alburn Facility.

38.    On the transit bus, everyone had to remain silent, no talking. The trip lasted for over 4 hours. During this time the handcuffs with the black box began to cause Plaintiff significant pain on his writs. They began to cause red marks and swelling and moving the cuffs on his writs did not eliminate the pain. Plaintiff asked the transit officers whether they could loosen the handcuffs because of the pain he was experiencing. The request was denied.

39.    While on the transit bus, Plaintiff had to use the bathroom. He tried to hold his urine, but could no longer do so. He took the journey of walking to the rear of the bus with an inmate shackled to his leg to use the restroom. In order to accomplish this feat, he and the inmate had to walk somewhat side ways in step. Failing to do caused the leg irons to cut into the ankle, which did occur. Once at the restroom, the inmate stands outside with one leg in the restroom sideways. Plaintiff in handcuffs with a black box attached, with difficulty un-zips and re-zip pants while the bus is moving. Unable to wash hands after using bathroom. During the

bus ride to Alburn, I developed a migraine headache causing me
to be nauseous and sick to my stomach.

40.    The transit bus arrived sometime after 6:00 pm at Alburn.
Plaintiff was placed in a holding pen, eventually the cuffs and
leg shackles were removed, he was search, placed in the B-Chair
for checking for weapons.

41.    When seen by the medical staff at Alburn, Plaintiff requested
pain medication because of his headache and writs were in pain.
He was hungery and stressed out. The medical staff stated that
they would bring the pain medication to his cell.  The pain
medication was never provided. Plaintiff had to suffer with a throbbing
headache and an upset stomach. He was placed in a double bunk cell
with another inmate and provided a cold meal.

42.    At Alburn, Plaintiff was confined to the cell for 24 hours.
he stayed at Alburn from Friday evening to Monday morning. During
that time period, he was not permitted to take a shower, exercise,
change his clothes, or call his family. Cold water for washing up,
no tooth brush, no reading material, although on the last day was
able to obtain a book. During the night it was extremely cold as
Plaintiff was on the bottom floor and the windows were either broken
or opened. Provided only a blanket, Plaintiff attempted to stay
warm by sleeping in all his clothes and his coat to no avail.

43.    Monday morning Plaintiff's nightmare began again. Starting
at 6:00 am, provided a bag breakfast, washed in cold water, no
toothbrush, and still had on the same clothes from 4 days ago.
About 7:00 am, again stripped searched and placed in a holding
pen for several hours. Shackled and handcuffed with black box,
and again shackled with leg irons to another inmate.

8.

44.    Plaintiff experienced the same problems he had on his trip to Alburn and now on his bus ride to Elmira. The bus ride to Elmira was about 4 hours with a stop at Southport Facility. Plaintiff was stressed, headache, his writ were still swollen and red with pain because of the handcuffs.

45.    At Elmira Facility, Plaintiff and other inmates remained on the transit bus handcuffed and legs shackled. Provided a bag lunch with the same food items provided previously at Wende. Late in the afternoon, sometime after 2:00 pm, the bus departed for the Downstate Facility. Inmates were threatened that if caught talking their personal property would be lost. For the bus ride for over 5 hours no taking was permitted aside from a 10 minute break for the bus driver. During this bus ride, Plaintiff's legs, back, wrists and head began to ache, as there was limited leg room, not permitted to stand or stretch. His wrists were swollen, red and sore. Using the bathroom on the bus was still difficult and with an inmate attached to your leg made matter worse. Did not complaint to the transit officer as knew from prior experience on other trips nothing would change and just had to deal with the situation.

46.    Sometime after 9:00 pm the transit bus arrived at Downstate. Plaintiff was in pain, stressed out emotionally, tired and hungry. He though he was going to be staying at Downstate because of the late hour, but was told would be leaving on a bus for Ulster Facility.

47. The handcuffs and leg irons were removed and Plaintiff was placed in a holding pen and given a cold dinner.  He remained in the holding pen until sometime after 12:00 am.

48.    When the bus arrived for Ulster, Plaintiff was again handcuffed

and placed in leg irons and attached to another inmate. On the bus to Ulster, Plaintiff noticed they were traveling back the way they came to Downstate. As it was now after 1:00 in the morning, he was sleep deprived, in pain, stressed out emotionally, totally exhausted and just wanted to get to the nearest facilty to get some rest and sleep. Plaintiff was constipated and had not made a bowel movement in several days from the food provided and being stressed out.

49.    Sometime around 4:00 am the transit bus arrived at Ulster. Tired, totally stressed out, in pain, sleep deprived, plaintiff's whole body seemed to be on fire from the pain he was experiencing in his wrist, headache, and lower back, along with his whole body tense.

50.    At Ulster, plaintiff's shackles and handcuffs were removed, searched, B-Chair used to check for weapons.Was provided a clean set of underwear, toothbrush, and bed linen. Plaintiff was seen by medical whose only concern was the medication he was taking. Was not provided no pain medication. Was taken to a dorm, not permitted to take a shower as was leaving in a few hours. Plainitff washed and laid down for about an hour before getting ready for the trip to Midstate Facility. About 6:00 am, had breakfast, then was stripped searched, handcuffed with black box and leg shackles and placed in a holding pen.

51.    About 10:00 am, Plaintiff was shackled to another inmate and placed on the transit bus for Midstate. He was again subjected to another grueling bus ride. The same discomforts he had from the beginning ride from Wende, and it seemed that there was no relief in sight. Completely drained, totally emotionally and physically stressed out, in pain with swollen wrists. He longed for this

nightmare to end.

52.    The bus arrived sometime after 2:00 pm at Midstate. The handcuffs and leg shackles were removed and was provided a bag lunch. Plaintiff was seen by medical. He asked again at that time asked about pain medication and how he was not provided any medication at the other facilities. The medical staff a nurse explained that because they do not have his medical history medication can not be given. He would have to sign up for sick call at which time they would be able to look at his medical records and provide pain medication. Plaintiff was seen by other personal at Midstate. He informed the draft officer that when he got off the transit bus he noticed there were only three bags of his property, and there should have been four. The draft officer said that was all the draft bags the Ulster bus provided and he would look into the matter.

53.    Plaintiff was told that he could pick up his property in the morning and was assigned a housing unit. He was able to take a shower in his socks as he had no shower shoes. He washed his underclothes, but because he did not have his property he wore none underneath as the underclothes had to dry. He tried to call his family to let them know were he was, as he had not spoken to them in five days. His telephone had been de-activated. The outer clothes he had on since he left Collins he still had to wear and sleep in.

54.    The following day, December 6, 2017, Plaintiff reported to the dratf room. When was provided only three bag of property, Plaintiff asked about the fourth bag. He was told by the draft officer that was all that arrived from Ulster and if it came on another bus it would be sent to him.

11.

55.    Plaintiff was also provided clothes for his release from prison. He was stripped searched and placed in handcuffs and leg irons. He was told that he was being transported to CNYPC. He was placed in a van and transported to CNYPC that was directly accross the street from Midstate.

56.    Upon arrival at CNYPC, Plaintiff  was processed, strip searched, seen by medical, provided a shower and issued CNYPC clothing. All of DOCCS clothing he was wearing was thrown away. The following day, Plaintiff's property was searched, all of DOCCS clothing that was packed up was confiscated and personal property that he was not permitted to have at CNYPC. Plaintiff was given the option to send it home, storage or have it destroyed. Plaintiff also inquired about his fourth bag of property whether it had been sent from Midstate and was told no.  Plaintiff inquired several other times over the year as to whether the fourth bag of property was ever sent by Midstate and the answer was always no.

57.    On December 10, 2017, Plaintiff directed a letter to the Superintendent of Collins about his lost bag of property and the actions of the draft officer regarding having to destroy his property and not permitting him to have his family pick up it up. That he was only permitted to take only four bags of personal property and what did not fit in those bags would have to be destroyed. Also that he was not permitted to speak to him about the destruction of his personal property. Plaintiff requested to be compensated for the destroyed and lost property.

58.    By letter dated December 20, 2017, but not received by

12.

Plaintiff until January 23, 2019, Deputy Superintendent of
Administration, P. Zaccagnini, addressed Plaintiff's letter
to Collins' Superintendent concerning his property claim. A
property claim was enclosed with the letter from Zaccagnino.
Regarding the property that was destroyed at Collins, Plaintiff
was unable to make a claim as no documentation was generated to
prove that the property was destroyed in order to file a claim.
Second, Zaccagnino did not provide a claim form until over a
year later in January 2019 with an enclosed letter back dated.
Third, DOCCS policy and procedures for claims related to inmates
in DOCCS custody and not residents at CNYPC whose property is
lost and destroyed after leaving DOCCS.

59.    Plaintiff in an attempt to recover his property that was
documented, had the Office of Mental Hygiene Legal Services contact
Collins on December 19, 2017, regarding his missing draft bag.
On January 2, 2018, Inmate Coordinator for Collins acknowledged
that Plaintiff left Collins with four bags of property, but when
he left Ulster, only three bags of property.  It was determined that
it was lost at Ulster and they cannot find it.

60.    After contacting Ulster, and the fourth bag of property could
not be located, Plaintiff submitted a property claim on March 19,
2018. Steward for Ulster, Rebecca Garlinghouse, on April 24, 2018
denied plaintiff's property claim stating that the "fourth bag was
received seperately and sent 12/7/17".

61.    The decision of Garlinghouse was appealed on May 2018 to
Ulster's Superintendent Wendland. After receiving no response
from Wendland, Plaintiff directed a letter to his attention on

13.

July 7, 2018 regarding the status of his appeal. A claim was filed
in the New York State Court of Claims on July 17, 2018 regarding
plaintiff's lost property bag.

62.    On May 2018, Steward of Ulster , Garlinghouse notified Eileen
M. Nerf, Supervising Budgeting Analyst for DOCCS and Megam A. Hughes,
Inmate Accounts, Ulster regarding Plaintiff's property claim appeal.
Deputy Superintendent for Security at Ulster, directed Sgt. Rene
M. Lawrence to investigate plaintiff's missing property. On April
4, 2018, Sgt. Lawrence informed Snyder that after his investigation
a late bag was received for Plaintiff and was sent on Decemebr7,
2017, therefore there should be no further property claim towards
Ulster. In support of his conclusion, he provided an alleged Inmate
personal Property Transfer Form indicating the bag was sent late.

63. The Property Transfer Form indicated that on December 7, 2017
a bag of plaintiff's property at Ulster was sent to Collins, the
receiving facility. The form was signed by Alexander C. Melnick,
C.O. , Draft Supervisor and Transportation Officer who was
responsible for transporting plaintiff's property bag to Collins.
No other information was listed when the bag was received at Collins
and who signed for it.

64.    On April 16, 2018, DDS Snyder informed Inmate Accounts at
Ulster, that he had reviewed plaintiff's proeprty claim and documentation
and according to Sgt. Lawrence, the late bag was sent on December
7, 2017, which totaled 4 bags and recommended the claim be denied.

65.    Plaintiff on April 24, 2018 by Hughes that his property claim
ad been thoroughly investigated and disapproved. A copy of the claim
denial was signed by Garlinghouse dated 3/23/18. The decision

14.

was appelaed to Ulster's Superintendent and Garlinghouse forwarded plaintiff's appeal to DOCCS Supervising Budgeting Analyst, Eileen M. Neif and M. Hughes, at Ulster on May 16, 2018.

66.    Senior Budgeting Analyst, Caroline D. Cipollino e-mailed Hughes on June 11, 2018 stating that there was no investigation of plaintiff's property claim as there was no documentation to support. Cipollino requested that Hughes clarify the claim saying that plaintiff received the 4th bag seperately and it was sent to CNYPC on December 7, 2017.

67.    In response to the investigation, Melnick informed Synder that plaintiff came to Ulster on December 4, 2017 on the Midstate bus, the PM Shuttle with 4 bags. Left on December 5, 2017 on the Midstate bus with 3 bags. On December 7, 2017 sent one bag to Collins. He can't figure out why it was sent to Collins, but that's were it might be.

68.    Synder at Ulster contacted Collins Facility and requested that a check of their property draft storage area for plaintiff's missing bag of property. On July 11, 2018, D.S.S. Poff informed Synder of negative results.

69.    On July 14, 2018, Synder informed Garlinghouse of C.O. Melnick's time line respecting plaintiff's 4th bag of property. In response Garlinghouse asked who's responsibility to contact Collins, Security or the Business Office? She was unsure about the investigation process.

70.    The resulting investigation, E. Nerf on August 31, 2018, determined that Plaintiff's claim be approved for $100.00. On September 14, 2018, plaintiff was informed that his claim was approved

for $100.00 by Hughes. Plaintiff rejected the reinbursement. He
had filed a claim in the Court of Claims on July 17, 2018.

71.    Plaintiff realleges and incorporates by references paragraphs
1 to 70.

72.    Defendant Annucci, Commissioner of DOCCS under his authority
pursuant to Correction Law §§ 23 and 112, directed   the transfer
of Plaintiff, an involuntary civilly committed mental patient,
from DOCCS custody to the custody of an OMH Facilty, located at
Central New York Psychiatric Center. Based on the law with his limited
discretion, Annucci was required to adhere to the laws regarding
treatment of mental patients adjudicated by the court for treatment
in a mental hospital.

73.    Plaintiff realleges and incorporates by references paragraphs
1 to 72.

74.    Defendant Annucci under his authority, his subordinates under
his direction, directed that Plaintiff be transported across the
State of New York for six days, using the existing DOCCS prisoner
transport system, rather than an individual transport to a mental
hospital in accordance with the rules and regulations outlined
in Title 7, 9, and 14 of NYCRR, based on Correction Law and
Mental Hygiene Law. In failing to follow the law as prescribed,
Defendants deprived Plaintiff of his property rights and protected
liberty  all in violation of his fourth and Fourteenth Amendment
to the U.S. Constitution.

75.    Plaintiff realleges and incorporates by reference paragraphs
1 to 74.

16.

76.    As a professional in his duties as Commissioner of DOCCS, Annucci, violated Plaintiff's substantive due process rights when he substantially departed from accepted professional judgment, practice, and standards as mandated by law with treatment and transportation of involuntarily committed mental patients.  The Commissioner's conduct as expressed herein, was unjustified by any governmental interest. It was used solely to punish Plaintiff, a sex offender, civilly committed under Article 10 of MHL. The commissioner was aware of these facts from which inference could be drawn, that he was placing plaintiff in a substantial risk of serious harm, as the laws were written to protect mental patients from such risks and totally disregarded those risks that Plaintiff was subjected to for days.

77.    Plaintiff realleges and incorporates by reference paragraphs 1 to 76.

78. Although Annucci and his subordinates were aware that Plaintiff was not an inmate and completed his prison term, and at the time of his transportation by correctional officer for six days, was a patient involuntarily civilly committed to a mental hospital, knew or should have known he was being deprived of his constitutional rights, being subjected to unsafe conditions. Defendants intended to confine him, even though they knew his confinement was unlawful and not in accordance with the provisions of the law, solely for punishment knowingly that there would be no accountability for their actions and conduct.  All in violation of Plaintiff's rights under the United States Constituion.

17.

79.   Plaintiff realleges and incorporates by reference paragraphs
1 to 78.

80.   Defendants' actions and the combination of the conditions
taken collectively was unjustified by any legitimate  governmental
purpose. Althought Plaintiff's transfer and treatment  to a civil
psychiatric hospital entitled him to enhanced due process protections
as expressed in Mental Hygiene Law  he was not provided such. His
confinement was suppose to be therapeutic, not punitive. Here
Defendants demonstrated a deliberate indifference to Plaintiff by
their substantial departure from prevailing professional standards
for a mental patient involuntarily confined in violation of his
substantive and procedural rights guaranteed by the U.S. Constitution.

81.   Plaintiff realleges and incorporates by reference paragraphs
1 to 80.

82.   Defendant Annucci and his subordinates violated Plaintiff's
constitutional rights, when as a citzen, involuntarily committed
to a mental hospital under Article 10 of MHL. He was not afforded
the same procedural protections ascribed to Article 9 patients
of MHL, who are transported individually to an OMH Facility
pursuant to a court order of commitment. Instead, Plaintiff was
trasnported all across the state of New York as punishment solely
because he was committed as a sex offender, all in violation of
the Fourth, Fifth, and Fourteenth Amendments.

83.   Plaintiff realleges and incorporates by reference paragraphs
1 to 82.

84.   Defendant Annucci, was grossly negligent in supervising his
subordinates with his failure to review and implement a policy

18.

and procedure that protects plaintiff and other similarly situated
patients committed under Article 10 to a mental hospital. Annucci
knew or should have known of the illegal treatment and transportation
of Article 10 patients in DOCCS' transport system to an OMH Hospital.
Plaintiff's situation was not an isolated occurrence. He has spoken
to other residents at CNYPC regarding their treatment and how DOCCS
trasfered them to CNYPC. They, based on information and belief,
that belief being personal conversation with CNYPC residents. Specific
residents at CNYPC described in detail of how they were transported
to a correction facility before he transfered to CNYPC. Some of
there personal property was stolen, destroyed, limited the amount
of property that they could take to CNYPC, and at times some residents
did not receive all their bags of personal property that was I-64
accounted for. Defendants made this an unwritten policy and practice
when it came to Article 10 patients, as oppose to the approved
rules and regulations defined in Correction Law and Mental Hygiene
Law. The treatment was not in harmony with the law, and was done
as a form of punishment as there was no justification for the denial
of due process  and equal treatment of a mental patient civilly
committed just because they were committed as a sex offender.

85.    Plaintiff realleges and incorporates by refernece paragraphs
1 to 84.

86.    Defendant Annucci and his subordinates, knew or should have
known, that their staff who committed the wrongful acts of transporting
Plaintiff in DOCCS' prisoner system, subjected him to unwanton infliction
of physical, emotional, and psychological harm. Then the taking

of his personal property and the destruction of some, was unlawful, and Defendants chose to disregard their staff's conduct in failing to take action that a reasonable supervisor would find necesssary to prevent such a risk. That failure caused a constitutional injury to Plaintiff and Defendants knowingly failed to take any corrective steps as it was excepted course of conduct.

87.  Plainitiff realleges and incorporates by reference paragraphs 1 to 86.

88.  Plainitff , when he was an inmate in the custody of DOCCS from prior experience with DOCCS's prisoner transport system, has experienced the treatment and substandard conditions complained of herein. On several occasions he has been transported across the state from a few days to a week, going from one facility to another.  In 2009, Plaintiff was transported from Wyoming Facility taking days before reaching Altona Facility. Then in 2011, experincing the same substandard conditions as an inmate going from Altona Facility for days before reaching Gowanda Facility. After remaining there for months was again transported back across the state to the Franklin Facility. In 2012 he was transfered to  Fishkill Facility from Franklin. A few months later after completion of his court imposed sentence, transferred to Collins Facility in March of 2012 until his civil commitment under Article 10 in December 2017.

89.  Plaintiff realleges and incorporates by reference paragraphs 1 to 88.

90.  The treatment Plaintiff received during each of those transfers from one correction facility  to another were always the same.

Each time he encountered the physical, swollen pain in his wrist from the handcuffs being applied tightly, and when complained was told by the transport officers the cuffs would not be reajusted and if continue to complain his property would be lost or a misbehavior report would be written. Unable to get pain medication for his migrain headaches or lower back pain. The food provided was always the same, brown bag meals and cold food. The bus ride was long sometimes up to 14 hours per day. After all these years of being transported across the state, nothing changed as it was excepted treatment for inmates being transported by DOCCS of substandard treatment and conditions. Thus, when Plaintiff was transported across the state by DOCCS, he experienced the same treatment and knew not to complain and the results from other inmates who did voice their complaint received unfavorable treatment.

91.    Plaintiff realleges and incorporates by reference paragraphs 1 to 90.

92.    Defendants knew and should have known that when they transported Plaintiff, a civilly committed mental patient, on the transport prisoner system, the conditions and treatment he would experience. Knowing that it was the practice and custom of treating prisoners during transporation was a sufficient departure from ordinary incidents inmates encounter in normal prison environment, yet, Defendants subjected Plaintiff to the unauthorized treatment and conditions.  The actions and conduct sustained by Plaintiff at the hands of Defendants amounted to punishment  for non-punitive reasons.

93.    Plaintiff realleges and incorporates by reference paragraphs 1 to 92.

94.    Defendants McGrath and Franchino, Asst. Commissioner and Deputy Commissioner of DOCCS, are responsible for the Movement and Control of inmate's movement from one facility to another facility in DOCCS' control. Said Defendants in their authority were responsible for causing Plaintiff, a mental patient committed to a mental hospital, under Article 10 for his movement across the state for 6 days before being released to OMH custody.

95.    Plaintiff realleges and incorporates by reference paragraphs 1 to 94.

96.    Defendants McGrath and Franchino authorized the transfer of Plaintiff that was not in accordance with DOCCS' regulations of transferring mentally ill patients to OMH. Defendants knew or should have known that their conduct and actions were in violation of statutory law and Plaintiff's rights as a civilian and not a prisoner or inmate. In doing so an inference can be drawn that Defendants intended to violate Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amentments .

97.    Plaintiff realleges and incorporates by reference paragraphs 1 to 96.

98.    Defendants McGrath and Franchino subjected Plaintiff as a mental patient to crual and unusual punishment for six days, even though they knew he should have been tranferred according to the rules and regulations established for transporting mental patients to a mental hospital. Their conduct was deliberate and used for punishment of Plaintiff as a sex offender under Article 10 of MHL.

22.

99.  Plaintiff realleges and incorporates by reference paragraphs
1 to 98.

100.  Defendants McGrath and Franchino, in their supervisory position
encouraged and permitted their subordinates to transfer Plaintiff
across the state for six grueling days that was contrary to rules
and regulations regarding treatment and transfers of mental patients
to a mental hospital outlined in Title 7, 9, and 14 of NYCRR, in
violation of Plaintiff's liberty interest and due process rights.

101.  Plaintiff realleges and incorperates by reference paragraphs
1 to 100.

102.  Defendants John and/or Jane Doe, staff in DOCCS' office of
Movement and Control in discharging their duties, issued an order
causing the tranfer of Plaintiff across the state for days in violation
of the Department's rules and regulation of transferring mental patients
to an OMH Facility. Defendants knew or should have known that such
transfer was illegal, but was commenced to punish Plaintiff although
a mental patient, because he was confined civilly as a sex offender,
under Article 10 of MHL. Doing so, in violation of his rights to
equal treatment of other similarily situated under Article 9 of
MHL. Also in violation of his Fourteenth Amendment.

103.  Plaintiff realleges and incorporates by reference paragraphs
1 to 102.

104.  Defendant, James Thompson, Superintendent of Collins Facility,
where Plaintiff was held after being adjudicated as a dangerous
sex offender with a mental abnormality under Article 10 of MHL,
failed to adhere to the rules and regulations of the procedures

regarding his transfer to an mental hospital under OMH control.
Defendant Thompson's actions and in-actions infringed on Plaintiff's
rights as a patient committed to a mental hospital, as to the
treatment and procedures for transferring of mental patients to
OMH Facility, as outlined in in Title 7, 9 and 14 of NYCRR.

105.  Plaintiff realleges and incorporates by references paragraphs
1 to 104.

106.  Defendant Thompson in his professional duties as Superintendent
of Collins Facility, was grossly negligent in supervising his
subordinates when a policy was created unwritten for destroying
Article 10's patients who were being transfered to an OMH Facility,
demonstrating deliberate indiffernce to their rights as defined
in Correction Law and Mental Hygiene Law.

107.  Plaintiff realleges and incorporates by reference paragraphs
1 to 106.

108.  Defendant Thompson, was grossly negelent by failing to train
and supervise his subordinates by permitting a policy against those
civilly committed under Article 10, to have their personal property
seized and destroyed in violation of their rights under the Fourth
Amendment. The deprivation of their personal property was not in
accordance with DOCCS rules and regulations. Defendants actions
of deprivation of ones personal property was not some random or
unauthorized act. Rather based on Plaintiff's account and other
similar Article 10 patients, the unwritten policy consisted of
seizing and destroying committed mental patients property without
even creating a record of its destruction as required by DOCCS
rules and regulations. Based on information and belief, that belief

24.

being the facts and records created or not created to show that the property was seized or taken without authorization. Based on the unwritten policy of destroying plaintiff's personal property without providing documentation, Defendants knew that once no longer in DOCCS custody there would be no accountability. Defendants were aware that Plaintiff and other similarly situated who had completed their court imposed sentence had a right to all their property they possessed at the time of their release as other inmates who are released after completion of their sentence are granted according to the law. Yet, refused to afford Plaintiff with those same rights to his property.

109.   Plaintiff realleges and incorporated by reference paragraphs 1 to 108.

110.   Defendants created a systematic unauthorized seize and destruction of Article 10 patients personal property knowingly that once they were no longer in DOCCS, there was no rule or regulation for residents in OMH custody to make a claim to recover their property that was illegally taken. Defendants knew or should have known that ones who completed their court imposed sentence, they are entitled to their money, clothing and other property. [Correction law 125]. Moreover, Title 7, 9, and 14 of NYCRR outlines the procedures for treatment and retention of mental patients personal property who are transferred to the custody of OMH. Defendants actions of taking and destroying Plaintiff's personal property was deliberate and intentional to punish Plaintiff, as they were under the assumption that there would be no accountability for their actions.

25.

111.  Plaintiff realleges and incorporates by reference paragraphs 1 to 110.

112.  Defendant P. Zaccagmino, Deputy Superintendent at Collins Facility, in his professional duties of supervising subordinates, was grossly negligent. Defendant was aware that his subordinate did not follow established rules and regulations regarding Plaintiff's personal property as he was not an inmate in DOCCS as he had completed his court imposed sentence. Rather than ascribe to the law surrounding returning and allowing Plaintiff to decide what he should do with his property he was taking to CNYPC, instead encouraged and supported the unwritten policy of seizing and destroying Plaintifff's property based on him being civilly committed under Article 10. Even when informed of the deprivation of Plaintiff's property Defendant Zaccagmino, attempted to cover-up the actions of his subordinate by waiting a year before acknowledging Plaintiff's property claim. The conduct was deliberate, intentional, and not some ramdom act, as Defendant was aware that the time to file a claim would be time barred.

113.  Plaintiff realleges and incorporates by reference paragraphs 1 to 112.

114.  Defendant Zaccagmino, encourage and permitted the unconstitutional practice after being informed of the violation through a report and failed to remedy the wrong. In his professional role , he was aware that the draft officer Szaluzzi failed to follow the procedure for one's property who are being released and not under DOCCs custody. He was also aware that even following the directive 2733 for transferring

inmate's draft bag property officer Szaluzzi failed to adhere to.
Although Plaintiff advised the Superintendent of these facts in
a letter, Defendant Zaccagmino declined to remedy the violation.
After being informed of the violate Zaccagmino showed deliberate
indifference to Plaintiff and his claim by deliberatly waiting for
the time for Plaintiff to file a Claim in the Court of Claim in
New York had transpired. Additional Zaccagmino knew that for Plaintiff
to file a claim in the Court of Claims, Plaintiff would first have
to exhaust DOCCS' administrative remedies outlined in Directive
2733. It was only then can an action be started in the claim's court.
Plaintiff was no longer an inmate in DOCCS and in order to file an
administrative claim in DOCCS and the court of claims require proof
of the lost or destroyed property and Zaccagmino had knowledge that
the draft officer did not file any documentation showing how Plaintiff's
excessive personal property was treated.

115. Plaintiff realleges and incorporates by reference paragraphs
1 to 114.

116. Defendants knew and were aware collectively that the seizure
and alleged destruction of Plaintiff's personal property was no
random or unauthorized act, as the chaim of command supported and
encouraged the unwritten policy and practice of seizing civilly
committed mental patients unlawfully, reasoning that there would
be no accounability and no repercussion of the seized property.
This was no isolated event, rather an ongoing practice as there is
no policy or procedure for ones who are no longer in DOCCS custody
and transferred to an OMH Facility, and Defendants were aware of
of that fact, thereby capitalizing on it to their advantage.

117.  Plaintiff realleges and incorporates by reference paragraphs
1 to 116.

118.  Defendant C.O. Szaluzzi, draft officer at Collins Facility,
seized and allegedly destroyed Plaintiff's personal property without
due process of law. The taking of Plaintiff's property was no random
or unauthorized act. Defendant Szaluzzi, knew that Plaintiff was
being transferred to an OMH Facilty as an civilly committed patient
under Article 10, and it was common practice to give the illusion
that procedures were being followed when packing up Plaintiff's
property for transfer. Although Plaintiff was not being transferred
to another correction facility, Defendant used Directive 4913 for
transferring inmates property from one facilty to another that the
inmate would be housed at. Even though Plaintiff was not going to
be housed at another correction facility and was going to CNYPC,
he had Plaintiff pack up one draft bag of state property, though
it was not needed. Denied Plaintiff a 5th draft bag to pack up his
legal materials as the directive allows. Then, denied him the right
to have his excess property sent home or have his family pick up
as the directive permits. When Plaintiff requested to speak to the
Superintendent that request was also denied. Nor was Plaintiff given
any forms to sign as required authorizing his property being destroyed.

119.  Plaintiff realleges and incorporates by reference paragraphs
1 to 118.

120.  Defendant Szaluzzi use of I-2064 Form to list property Plaintiff
could take was designed to limit the amount of property he was going
to CNYPC with and the remainder he held and seized and allegedly
destroyed. Yet there is no documentation that his property was destroyed.

By Szaluzzi's actions show that he knew what he was doing and his
intentions was to seize Plaintiff's personal property with the belief
that there would be no account ability as there was no documentation
to substantiate any cliams Plaintiff might bring concerning the
destruction of his personal proprerty, especially since he would
no longer be within DOCCS custody.

121.  Plaintiff realleges and incorporates by reference paragraphs
1 to 120.

122.  Plaintiff's rights to substantive and procedural rights were
violated by Defendants  by the aforementioned actions from his
transfer in DOCCS transportation system and the unlawful seizure of
his personal property. Plaintiff being involuntarily confined
possessed a liberty interest which was significant deprivation
of that interest when he was not afforded sufficient procedural
safeguards on his treatment as defined in Correction Law, Mental
HYgiene Law , and enforced through Title 7, 9, and 14 of New York
Code Rules and Regulations.

123.  Plaintiff realleges and incorporates by reference paragraphs
1 to 122.

124.  Each Defendant in concert with each other, discriminated against
Plainitff because he was a sex offender confined civilly under
Article 10 of Mental Hygiene Law. Defendants' knew that Plaintiff
has served his prison term and no longer a prison inmate and treated
him different from other mental patients civilly committed, by
transporting him in unsafe conditions, indifference to his medical
needs and caused excess bodily injury, in violation of his substantive

due process rights.

125.  Plaintiff realleges and incorporate by reference paragraphs 1 to 124.

126.  The conduct of illegally taking Plaintiff's personal property by Defendants  was intentional and not some random act. The deprivation by Defendants at Collins Facility, was caused by an unwritten policy of seizing the personal property of Article 10 patients committed to CNYPC without legal authority. The actions stated was supported by Supervision at Collins, as they failed to train, discipline its employees, thereby acquiescing in their supervisory role.

127.  Plaintiff realleges and incorporate by reference paragraphs 1 to 126.

128.  Plaintiff has a property interest and Defendants acting under the color of law, deprived him of his property without a constitutional adequate process. The post-deprivation remedy is inadequate in that there is presently no process for former inmates who have completed their prison sentence and then transferred to an OMH hospital to make a claim regarding their lost or destroyed property. All in violation of the Due Process Clause of the federal Constitution.

129.  Plaintiff realleges and incoporate by refernece paragraphs 1 to 128.

130.  According to the existing DOCCS Directive 2733 and N.Y. Court of Claims § 10(9), an inmate can not file a claim against DOCCS for lost or destroyed property until he has exhausted DOCCS' administrative remedies. In support of that claim under Directive 2733 and the Court of Claims an inmate is required to substaniate that claim with documentation of the lost  or destroyed property. In addition must

file his claim within the prescribed timeframe or the claim is barred.

131. Plaintiff realleges and incorporates by reference paragraphs 1 to 130.

132. The existing Directive 2733 relates to inmates in DOCCS custody and not to individuals who are no longer in DOCCS custody. Nor is there a process in place for patients transferred to an OMH facility who property is lost or stolen or destroyed by DOCCS. This is especially important when DOCCS officials fail to document the property taken from former inmates and respond in a timely manner to and enable him to seek relief in the Court of Claims in a timely manner.

133. Plaintiff realleges and incorporates by reference paragraphs 1 to 132.

134. Plaintiff rights to Due Process were not afforded to him. While the policy of seizing his property was not engraved in an adopted rule or regulation, nevertheless, it was a practice of DOCCS employees that was so permanent and well settled as to imply the constructive acquiesence of senior officials at Collins Facility. Plaintiff was not given any meaningful notice of the procedure for recovering his alleged destroyed property until a year later after the time to file any meaningful claim with DOCCS or the Court of Claims. Without proper notice and process, it is improper to place the burden on Plaintiff to demonstrate proof to establish that he had a post-deprivation remedy without notice of the actual procedures for making claims against DOCCS regarding the destruction of his property when no longer in their custody.

135. Plaintiff realleges and incorporates by reference paragraphs 1 to 134.

136.  Defendants John Doe(s), Transportation Officers on the bus ride on December 1, 2017, from Wende to Alburn Facility, from about 2:00pm to 8:00 pm, denied Plaintiff substantive due process by their egregious conduct of placing handcuffs and a blackbox on his writs so tight that they caused significant pain, redness and swelling. When he asked the officers to relieve the pain by lossening the handcuffs he was denied the request. Plaintiff had to suffer for hours in pain and suffering as the officers were inanttentive to his plight.

137.  Plaintiff realleges and incorporates by reference paragraphs 1 to 136.

138.  Defendant Jane Doe, Nurse at Alburn Facility, on or about 8:00 pm, showed medical indifference to Plaintiff regarding the pain he was having. Plaintiff brought to the receiving nurse's attention that he was having pain in his wrist, his back and a migrain headache. The nurse informed plaintiff that when he was in his cell, the pain medication would be provided. When he asked the officer about receiving the medication, said he would check. The pain medication was never provided and plaintiff had to be in pain all night and with a throbbing headache which also caused him to have an upset stomach and unable to eat. The actions of nurse Jane Doe, denied plaintiff medical attention reflecting an indifference to his medical needs in violation of his rights under the Fourteenth Amendment.

139.  Plaintiff realleges and incorporates by reference paragraphs 1 to 138.

140.  Defendants John Doe(s), Transportation Officers on the bus ride from Elmira to Downstate on the 4th of Decemeber were egregious

in their conduct by placing the handcuffs and blackbox on his writs again so tight, that Plaintiff was subjected to the same treatment he received from the other transit officer. Although he asked that the handcuffs would not be put on so tight his concerns were ignored. Plaintiff had to endure the pain from Elmira to Downstate Facility for over 12 hours. Defendants knew that plaintiff handcuffs were tight and simply ignored his reasonable request so that he would not be in pain. This was especially concerning as his  writs were swollen from the last time they were placed on him. Defendants inflicted punishment of Plaintiff in violation of his Fourteenth Amendment rights under the U.S. Constitution.

141.  Plaintiff realleges and incorporates by reference paragraphs 1 to 140.

142.  Defendant Jane Doe, Nurse at MidState Facility, on or about December 5, 2017 , 2:00 pm, demonstrated indifference to Plaintiff's medical needs. Plaintiff after arriving at Midstate explained to the nursing staff of the pain he was experinceing, from his writs, back and a headache, and how he wa unable to receive any pain medication. The nurse explained to Plaintiff that they can not provide medication to transit inmates because they do not have their medical records. That he would be unable to provide him any medication for pain and he would have to sign up for sick call the following day. Plaintiff was transfered  the following day to CNYPC. The unreasonable denial of medical treatment to Plaintiff an involuntarily committed mental patient, showed a deliberate indifference to his due process rights.

143. Plaintiff realleges and incorporates by reference paragraphs 1 to 142.

144. Defendants transporting Plaintiff, a civilly commited mental Patient, violated his rights under the Due Process Clause, when they acted in a way that was extreme and outrageous. In doing so, caused him to suffer physical injury and substantial emotional distress. Plaintiff emotional stess has extended to his civil confinement at CNYPC. He has declined outside medical treatment to Walsh Facility because he becomes emotionally stressed when he has to be transported recalling the experience he has had over the years in his treatment at DOCCS system of transportation.

145. Plaintiff realleges and incorporates by reference paragraphs 1 to 144.

146. Mental Hygiene Law (MHL) defines the treatment of mentally ill patients civilly committed. Correction Law defines punishment for inmates sentenced under Criminal Law. Plaintiff a civilly committed patient, under MHL describes the treatment he should receive and not Correction Law as he was no longer serving a prison sentence. Defendants treated Plaintiff differently from other similarily situated civilly committed patients as prescribed under MHL.

147. Plaintiff realleges and incorporates by references paragraphs 1 to 146.

148. Patients, as Plaintiff , like other similarily situated are entitled to substantive due process as mandated in MHL as the purpose is to receive treatment and not for exacting punishment.

34.

Mental Hygiene Law does not differentiate transportation of civilly
committed to an OMH hospital, regardless of whether they are
committed under Article 9 or 10. Defendants treated Plaintiff
as an inmate and disregarded the treatment of those civilly committed
of Mental Hygiene Law and its rules and regulations under Title
14 of NYCRR. Plaintiff's treatment in his transportation through
the DOCCS system , differently from other civilly committed,
was intentional and done solely because he was committed as a
sex offender. Plaintiff's denial of equal treatment as other
mental patients, was not reasonably related to any legitimate
penological interest for having him transported through the DOCCS
system for inmates serving a prison sentence when MHL describes
the procedures for transporting mental patients.

149.  Plaintiff realleges and incorporates by reference paragraphs
1 to 148.

150.  Plaintiff like other similarily situated inmates who have
who have completed their court imposed sentence is entitled to
all his personal property upon his release from DOCCS. Likewise
civilly committed patients under Article 9 of MHL are entitled
to their personal property in accordance with Title 7 of NYCRR.
Defendants violated Plaintiff's right to equal protection of
the law when they seized his personal property without due process
of the law. As Plaintiff was no longer an inmate serving a sentence,
he was entiled to all the protections afforded to him under the
United States Constitution, of which he was not.

151. Plaintiff realleges and incorporates by references paragraphs 1 to 150.

152. Defendants in their individual and official capacity, taken collectively, knew or should have known that there was a substantial risk to Plaintiff when they inflicted unnecessary physical, emotional and psychological harm to him as an involuntary civilly committed Article 10 patient, all in violation of his substantive due process rights to the U.S. Constitution.

153. Plaintiff realleges and incorporates by reference paragraphs 1 to 152.

154. All the conditions and actions Plaintiff experienced at the hands of DOCCS officials posed an unreasonable risk to his health. The actions of Defendants were intentional and failed to act with reasonable care  to mitigate  the risk to Plaintiff which posed an excessive risk to his safety by transporting him from one correctional facility to another for days.

155. Plaintiff realleges and incoporates by refernce paragraphs 1 to 154.

156. The totality of the conditions and actions of Defendants , that even though certain conditions mught not be unconstitutional on their own, added up to create an overall effect that was unconstitutional, as multipe conditions add up to create a single indentifiable harm. Taken collectively violated Plaintiff's due process rights under the Fourth and Fourteenth Amendment.

157. Plaintiff realleges and incoporates by reference paragraphs 1 to 156.

158.   Defendants at Ulster Facility, individually or/and collectively acted with reckless and callous disregards for plaintiff's rights to his personal property, by intentionally taking, and then attempted to cover up their conduct with the filing of false records. While the process of recover of the lost property seemed to be fair, the goal of Defendants was to punish plaintiff an article 10 patient committed as a sex offender to CNYPC.

159.   Plaintiff realleges and incorporates by reference paragraphs 1 to 158.

160.   Defendants at Ulster treated Plaintiff's personal property differently from inmates in custody at DOCCS, as they have a written procedure for filing claims for lost and destroyed proeprty. Plaintiff is not afforded such procedures once he is no longer in DOCCS custody. Defendants were aware of these facts and sought to take advantage by confiscating Plaintiff's personal property with the belief that their conduct  would not be discovered.  Their conduct was intention with no accountability for their actions aside from providing compensation for the stolen property, all in violation of Plaintiff's rights to equal treatment.

161.   Plaintiff realleges and incorporates by reference paragraphs 1 to 160.

162.   Plaintiff's rights under the Equal Protection Caluse was violated by Defendants at Ulster, when he was treated differently from other inmates with respect to his property because he was an Article 10 patient and being transferred to CNYPC. The intentional treatment of DOCCS officials was no random action, rather was designed to punish Plaintiff and there was no basis for the different treatment

37.

163. Plaintiff realleges and incorporate by reference paragraphs
1 to 162.

164. Defendants in DOCCS and others were treated differently
with unequal treatment by discriminating against them as sex offenders
committed under Article 10 with the lost and/or destruction of
their personal property. Rather than afford Plaintiff and other
Article 10 patients with the rights to all their personal property,
as directed by law as is required for Article 9 patients, their
property was confiscated without due process of law. Plaintiff
have spoken to numerous residents at CNYPC and described in detain
how either their property was not permitted to be packed up or how
when they arrived at CNYPC all their property was not provided by
DOCCS. The residents further recounted that they were never informed
or told of the process of how they could make a claim against DOCCS
for their proeprty lost as they were no longer in DOCCS custody.
Unlike inmates in DOCCS, presently their is no policy or procedure
for residents whose proeprty is taken to make aclaim, thereby denial
of equal treatment and in violation of the Due Process Clause of
the Constitution.

165. Plaintiff realleges and incorporates by referene paragraphs
1 to 164.

166. The actions of Defendants is not an isolated or random event,
rather an on going practice. Defendant are aware that there is no
written policy or procedure to hold Defendants accountable and thus
seize Article 10 patients property with no impunity for their conduct.
At most, as in Plaintiff's case was able to timely make a claim
regarding his draft bag of property, but not for the destroyed property.

167.  Plaintiff realleges and incorporates by reference paragraphs 1 to 166.

168.  Defendants, Snyder, and Lawrence, in their supervisory duties knew or should have known regarding the other defendants illegal conduct of taking Plaintiff's personal property when they created and submitted falsified documents to cover-up their conduct. Although they had a responsibilty to intervene, acquiesced and permitted the conduct to go unabated. Presently there has been no accountability for the conduct of Defendant Cate. Unless restrained Defendants will continue in their course of conduct of depriving residents at CNYPC of their personal property without an adequate recourse. All the mentioned actions and conduct by Defendant are in violation of substantive due process and equal treatment as a matter of law.

169.  Plaintiff realleges and incorporates by reference paragraphs 1 to 168.

170.  Defendant Zaccagnini, knew that Plaintiff had been deprived of his personal property and provided meaningless relief. The deprivation of Plaintiff of his liberty interest in his property was neither random nor unauthorized. Defendants willful failure to follow DOCCS establish procedures to enable Plaintiff to make a timely claim was foreseeable, as Defendant possessed the state-authority to timely respond to Plaintiff's claim. Due Process require that Plaintiff be afforded the procedures necessary to file a claim in a specific time period, not just in a meaningful manner, but also at a meaningful time. Defendant's actions denied Plaintiff an adequate remedy to challenge the destruction of his property  rendering due process insufficient.

171.  Plaintiff realleges and incorporates by reference paragrphs
1 to 170.

172.  The actions and conduct of Defendants in their respective
roles at Ulster, could have been anticipated and prevented the
unauthorized deprivation of Plaintiff's property. Presently there
is no feasible remedy to investigate the taking of civilly committed
patients property who are no longer in DOCCS custody, and the post-
 deprivation remedy does not provide all the process that was due
under the constitution.  Although procedures exist, but not followed
resulting in no meaningful post-deprivation remedy. Especially when
the deprivation of Plaintiff's property was foreseeable and at a
predicate point, not some random or unintention act by Defendants.

173.  Plaintiff realleges and incorporates by reference paragraphs
1 to 172.

174.  Defendant Wendland, Superintendent of Ulster, in review of
Plaintiff's proeprty claim, knew or should have known that the conduct
of his subordinates' behavior was illegal, intention and not some random
act. When  Wendland reviewed the falified documents and reports
created by his subordinates, supported the unwritten policy and procedures
of seizing Plaintiff's personal property, instead of discipining
his officers for their illegal conduct. Thereby denial of Plaintiff's
an adequate post-deprivation remedy which was not adequate to
satisfy  due process for civilly committed patients being transfered
to CNYPC.

175.  Plaintiff realleges and incorporates by reference paragraphs
1 to 174.

176.  Defendant Roy P. Snyder, Deputy Superintendent of Security at
Ulster, violated Plaintiff's rights to meaningful due process, when
he knew or should have known upon his review of documents and reports
from his investigation that his officers created a false narrative
to cover-up their illegal conduct of stealing plaintiff's personal
property bag. The actions of said officers was not some isolated
event, rather a conscious effort to conceal their illegal conduct.
Defendant Snyder supported the actions of his officers by his failure
to correct and discipline the illegal conduct of his officers as it
was not some random act. Although he had the responsibility and duty
to intervene, acquiesced and permitted and therefore authorized the
and encouraged the unauthorized conduct of taking civilly committed
patients property who are being transferred to CNYPC, under the
belief there would be no accountablity. Hence infringing on Plaintiff
and other similarly situated, cosntitutional rights to meaningful
procedural and liberty interest in their personal property.
177.  Plaintiff realleges and incorporated by reference paragraphs
1 to 176.
178.  Defendant Lawrence at Ulster, in conjunction with other Defendants
from his investigation, knew or should have known that his officers
were violating Plaintiff's rights under the due process when they
seized plaintiff's  personal property and covered up their illegal
conduct with false documentation. The actions of Defendants was no
random act, rather an unwritten policy of taking civilly committed
personal property knowing that there would be no accountability
for said conduct.  The policy was authorized by Defendants that
resulted in the deprivation of Plaintiff's property as to make the

injury suffered by plaintiff foreseeable rendering the procedural remedies inconsequential when there is no consequences for illegal conduct by officers.

179. Plaintiff realleges and incorporates by reference paragraphs 1 to 178.

180. Defendant Lawrence abrogated his duties and responsibilities in his complicity regarding other defendants' illegal conduct of taking plaintiff's personal property. Defendant knew or should have known that the illegal seizure , cover-up, and adhere to established policy and procedures, was in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments.

181. Plaintiff realleges and incorporates by reference paragraphs 1 to 180.

182. Defendant Melnick at Ulster, in support of the seizure of Plaintiff's personal property, was no random or unauthorized practice. The practice was sanctioned and permitted by DOCCs officials under the presumption there would be no accountability for their conduct. When accountability was questioned Melnick submitted false documents to cover-up  his illegal conduct. The actions of Defendant Melnick was no isolated or random occurrence rather a practice of seizing other civilly committed property knowing there would be no meaningful investigation.  Defendant's actions sought to deprive Plaintiff of his liberty interest in his property  and denial of his rights under the Fourth and Fourteenth Amendments to the Constitution.

183. Plaintiff realleges and incorporates by reference paragraphs 1 to 182.

184. Defendant Garlinghouse, at Ulster, aided said Defendants in

their illegal conduct when she became aware through her investigation

of Plaintiff's property claim  by her complicity, to protect

his substanial and procedural due process. Defendant sanctioned

the conduct of DOCCS officials as there were adequate procedures,

and not followed rendered no meaningful predeprivation was possible.

Because there was a process in place, Defendant could have guarded

in advance the deprivation of Plaintiff's property claim to protect

the adequacy  of the procedure. Defendant Garlinghouse acquiesced

in her responsibility by attempting to conceal the illegal conduct

of Defendants' unwritten practice of seizing Plaintiff's property

a  civilly committed patient, with no impunity, on the conduct of

DOCCS' employees.

185.  Plantiff realleges and incorporates by reference paragraphs

1 to 184.

186.  Defendant Cata, an officer at Ulster while in the draft processing

room, created a false report, alleging that Plainitiff's property

bag had been sent to Collins, when he knew or should have known

the property bag had been seized at Ulster by staff. Defendant Cata,

created a false report to conceal the practice of taking patient's

personal property who have been committed to CNYPC under the belief

there would be no accountability of the illegal conduct of employees

at Ulster. In the conduct of Cata, conspired with other defendants

to conceal ones malfeasances and violate Plaintiff's rights under

the  Fourth and Fourteenth Amendments.

187.   Plaintiff realleges and incorporates by reference paragraphs

1 to 186.

188.  Defendant Hughes at Ulster was negligent in her duties to

protect Plaintiff's rights under the Fourteenth Amendment of the

Constitution. Defendant's Huges actions in her complicity with other defendants to cover up the illegal conduct, continued the ongoing practice of said defendants in depriving Plaintiff and other patients being transferred to CNYPC without all their property. The inactions and actions were intentional under the presumption that there is no accountability once Plaintiff and others Article 10 sex offenders are no longer in DOCCS custody.

189.  Plaintiff realleges and incorporates by reference paragraphs 1 to 188.

190.  Defendant Neif, Budget Analyst for DOCCS, by her conduct conspired with other defendants to cover-up the illegal conduct of seizing property of civilly committed Article 10 patients by offering a token of the value of Plaintiff's property under the false belief that there would be no accountability of DOCCS employees illegal conduct. Based on Neif's investigation, knew or should have known that the conduct of taking Plaintiff's property was no random or isolated event. Defendant Neif officiated her duties in providing meaningful review and determination of Plaintiff's claim, thereby denying him a meaningful process due under the Due Process Clause of the Constitution.

191.  Plaintiff realleges and incoporates by reference paragraphs 1 to 190.

192.  Defendants in totality conspired with each other to fulfill their objective in attempting to cover-up the illegal conduct and practice of the unwritten policy of seizing Article 10 patients proeprty. Whether implicitedly or explicitedly as had been the practice of seizing property of patients being transferred to CNYPC with no further accountability as ones are no longer in DOCCS custody and no meaningful review by ones who are no longer in their custody.

193.  Plaintiff realleges and incorporates by reference paragraphs 1 to 192.

194.  Defendants under the false belief that their unwritten policy of illegally taking Article 10 patients property who would no longer be in Doccs's custody was not an isolated or random event. Rather a systematic and ongoing practice as there has been no accountability aside from one who may file a time claim, which is rare, thereby breathing life to this illegal pratice. Aside from maybe receiving a tooken value for the seized property, there is no accoutability for the illegal conduct of Defendants. The post-deprivation process is fallacious and inadequate for patients under Article 10 once outside of DOCCS rules and regulations , to obtain a meaningful review  and accountability of allegedly lost or destroyed personal property due under the Due Process Clause of the U.S. Constitution.

195.  Plaintiff realleges and incorporates by reference paragraphs 1 to 194.

196.  Defendants unless restrained will continue in their practice of depriving Plaintiff and other  of their personal property with no menaingful post-deprivation remedy. The illusion of providing a post-deprivation remedy, is just that an illusion as the conduct of defendants is not addressed , creating an unwritten policy that that there would be no accountability with only a meager compensation for seized property, and no punitive measures  for the illegal conduct. All the aforementioned conduct and actions are in violation of the First, Fourth and Fourteenth Amendments to the Constitution.

197.  Plaintiff realleges and incorporates by reference paragraphs 1 to 196.

45.

198.   Defendants violation of the Civil Rights Act of 1964, occurred when Plaintiff, a civilly committed Article 10 sex offender, was intentionally discriminated against, when he was treated harsher than other involuntarily committed Article 9 patients, when he was transported across the state of New york for six days, representing cruel and unusual punishment because he was a sex offender committed involuntarily.

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in all respects;

1. A declaration that the acts and ommissions described herein violated Plaintiff's rights under the constitution and laws of the United States;

2. Award compensatory damages in an amount to be determined according to the proof by Plaintiff against all said Defendants in their individual and official capacity;

3. Award punitive damages in the amount as the jury may determine sufficient to punish Defendants for and to deter others from committing constitutional violations as alleged in the Complaint;

4. Award damages for the pain and suffering, along with the emotional and psychological suffering by Plaintiff as stated in the Complaint.

5. Injunctive relief preventing Defendants from further engaging in unconstitutional practices as set forth in the Complaint;

6. To Award Plaintiff, cost, fees, expenses, and those associated with the prosecution of this Complant, and reasonable attorney fees

46.

pursuant to 42 U.S.C. § 1988, and other state laws;

    7. A jury trial on all issues triable by jury;

    8. Grant other and further relief as the Court deem just and

proper.

Dated: _February 20, 2021_                         _____

                                             Daniel Jones
                                             Plaintiff, Pro se

VERIFICATION

    I have read the foregoing complaint and hereby certify that
the matter alleged herein are true, except as to the matters alleged
to be and upon information and belief. I certify under penalty
of perjury the foregoing is true and correct.

EXECUTED: Central New York Psychiatric Center
          9005 River Road
          P.O. Box 300
          Marcy, New York 13403-0300

DATED: February 20, 2021

_____
Daniel Jones

Daniel Jones, C22582
CNYPC
P.O. Box 300
Marcy, New York 13403-0300


February 20, 2021


United States District Court
Western District
Mary C. Loewenguth
Clerk of the Court


Re:  Daniel Jones v. McGrath, et al.
     Case No.: 20-cv-1417


Dear Clerk:

     Enclosed find Amended Complaint in reference to the above
matter. Pursuant to the court's order dated Janaury 26, 2021,
granting an extension of time to file by March 3, 2021, my amended
complaint is timely.

     Please file these papers with the court.

     Thank you for your attention to this matter herein.


Very truly yours,


Daniel Jones


enclosures:

Daniel Jones, C22587
CNYPC
P.O. Box 300
Marcy, New York 13403-0300



USUC - WDNY
FEB 24 2021
BUFFALO

20-CV-1417

United States District Court
Western District
Mary C. Loewenguth
Clerk of Court
200 U.S. Courthouse
Buffalo, New York 14202

